[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 202 
 On Application for Rehearing
This Court's opinion of February 1, 2008, is withdrawn, and the following is substituted therefor.
St. Vincent's Hospital petitions this Court for a writ of mandamus directing the Jefferson Circuit Court to vacate its order denying St. Vincent's motion for a protective order seeking relief from an order requiring it to answer certain interrogatories and to produce a variety of records, including the identifying information and the medical and billing records of 19 nonparties — the parents and guardians of fetuses that were stored in St. Vincent's morgue with Kyle and Wendy Wadley's fetus. We grant the petition in part, deny it in part, and issue the writ.
 I. Factual Background
On December 13, 2000, Kyle Wadley and Wendy Wadley, who was pregnant, visited Dr. Timothy L. Stone for a routine prenatal examination. During this examination, Dr. Stone informed the Wadleys that the fetus Wendy was carrying ("the fetus") had expired at about 15 weeks' gestation. On December 15, 2000, Dr. Stone admitted Wendy to St. Vincent's Hospital for delivery of the deceased fetus.
After the delivery, the Wadleys told Dr. Stone (1) that they did not want an autopsy or any pathological testing performed on the fetus and (2) that they wanted the fetus to be cremated. A nurse witnessed these conversations and noted the Wadleys' wishes in the medical records.[1] Wendy alleges that before her discharge from St. Vincent's on December 16, 2000, she *Page 203 
asked a nurse when the cremation of the fetus would occur. Wendy alleges that the nurse told her that the fetus would be cremated within a few days at the University of Alabama at Birmingham ("UAB") hospital because St. Vincent's did not have a crematorium. St. Vincent's asserts that the Wadleys did not request the ashes of the fetus because, it says, the Wadleys knew that the fetus's ashes would be mixed with the ashes of other fetuses.
St. Vincent's policies and procedures require that all fetuses less than 20 weeks' gestation be directed through the hospital's pathology department, which is staffed by Cunningham Pathology, LLC, regardless of whether pathological testing is to occur on the fetuses. The policies and procedures further require that a nurse complete (1) a pathology ticket and (2) a release-to-pathology form that requires the signature of the parents of the fetus. Dr. Stone testified that he completed a pathology ticket for the fetus because he believed the ticket was needed to identify the fetus for its transport to UAB. The Wadleys state that they never signed a release-to-pathology form for the fetus.
On December 19, 2000, Dr. Richard Lozano, a pathologist and an employee of Cunningham Pathology, LLC, performed postmortem testing on the fetus. The fetal remains were then taken from the pathology department to the morgue at St. Vincent's. In January 2001, Cunningham Pathology sent Wendy a bill for $645. The Wadleys telephoned Cunningham Pathology to inquire about the bill because, they say, they believed that Cunningham Pathology had sent the bill mistakenly. The Wadleys testified that, when they heard no more concerning the bill they believed that Cunningham Pathology had corrected what they thought to be a billing error. A collection agency engaged by Cunningham Pathology later demanded payment from the Wadleys. The Wadleys state that in an attempt to ascertain the basis for the pathology charges, they telephoned Cunningham Pathology in March 2003 and were told that the bill was for pathological testing performed on Wendy's placenta per hospital policy. In May 2003, Wendy retrieved her medical records from St. Vincent's, which included a pathology report describing tests performed on the fetus.
 II. Procedural History
On February 26, 2004, the Wadleys sued St. Vincent's, Cunningham Pathology, Sharp Stone Obstetric/Gynecology, P.C., Dr. Stone, and Dr. Lozano in the Jefferson Circuit Court. The Wadleys asserted claims of misrepresentation, fraud, suppression, negligence, wantonness, recklessness, the tort of outrage, breach of contract, "tortious interference of a dead body," wrongful handling of a dead body, trespass, and intentional infliction of emotional distress. They sought compensatory, punitive, and all other damages to which they may be entitled, including damages for mental anguish and emotional distress. The Wadleys amended their complaint on four occasions. Relevant to this case, in the third amended complaint, the Wadleys dismissed their claims that St. Vincent's and Dr. Stone had fraudulently misrepresented that no testing would be performed on the fetus.
On July 2, 2004, the Wadleys served St. Vincent's with a request for production of documents. Request for production no. 29 sought "copies of any and all pathology or morgue log books or sign-in records (however designated) for the month of December 2000." St. Vincent's objected to this request on the grounds that it sought irrelevant and immaterial information, which it says was not reasonably calculated to lead to the discovery of admissible evidence, and that it sought the protected health *Page 204 
information of nonparties. However, St. Vincent's later produced a morgue report with the names of the patients redacted and a cremation record that indicates that St. Vincent's cremated the fetus with 19 other fetuses. The names of the parents of the 19 other fetuses are redacted from the cremation record. St. Vincent's asserts that the cremation record indicates that it cremated 20 fetuses — including the fetus — on June 3, 2002. Yet the Wadleys note that in what appears to be a listing of the birth dates of the 20 fetuses cremated, one date is August 3, 2002.
The Wadleys allege that until St. Vincent's informed them on August 31, 2004, that it cremated the fetus on June 3, 2002, they believed that UAB had cremated the fetus within a few days of the delivery on December 15, 2000, as a St. Vincent's nurse had allegedly represented to them. Before the cremation on June 3, 2002, St. Vincent's stored the fetus in its morgue with other fetuses. The Wadleys allege that St. Vincent's stored the 20 fetuses cremated on June 3, 2002, in one "picnic cooler" in its "freezer."
The record indicates that St. Vincent's uses an on-site incinerator to cremate fetal remains because it does not have a crematorium. St. Vincent's states that because the incinerator is used daily for disposing of medical waste, it cannot reasonably shut down and clean the incinerator to cremate one fetus. Thus, St. Vincent's asserts that the cremations of fetuses occur at the hospital only when a sufficient number of fetuses accumulate in the morgue to justify shutting down and cleaning the incinerator to prepare for the cremations.
After the Wadleys learned about St. Vincent's handling of the fetus, they amended their complaint to add Count XI, entitled, "Pattern and Practice — fraud and suppression counts," which states:
 "6. The Plaintiffs hereby adopt and reallege, as if set out in full herein, each and every one of the above paragraphs and their prior Complaints.
 "7. All of the Defendants' conduct described herein and in all prior Complaints was in line with their pattern and practice of committing the fraud and suppression claimed in this action. Such fraud and suppression is more specifically set forth and adopted herein by separate fraud and suppression counts in Plaintiffs' Complaints. Each of those fraud and suppression counts in the Complaints hereby adopts and sets forth therein this Pattern and Practice Count.
 "8. Additionally, St. Vincent's promised to timely have [the fetus] cremated, but did not. Rather, in accordance with its pattern and practice, St. Vincent's held [the fetus] in its morgue freezer for about one-and-one-half-years before allegedly cremating [the fetus].
 "9. St. Vincent's had a pattern and practice of not timely cremating babies and holding them in its freezer for unreasonable periods of time as evidenced by St. Vincent's holding at least nineteen (19) other babies in its freezer for up to two (2) years before allegedly cremating them as promised to their parents or custodians.
 "10. Upon learning of the Defendants' conduct, the Wadleys first suffered and continue to suffer severe emotional distress and mental anguish as a proximate result of the Defendants' conduct as described herein."
(Emphasis added.)
The Wadleys later served St. Vincent's with several consolidated requests for discovery. In relevant part, the request served on November 17, 2004, and entitled "Plaintiffs Second Consolidated Discovery Requests to St. Vincent's Hospital" states: *Page 205 
 "1. Please list the name, mailing address, social security number, date of delivery, and date of expiration of each and every fetus or baby that was to be cremated and was held by St. Vincent's in its freezer(s) for a period of more than seven days from January 1, 1999 through December 31, 2003.
 "2. Please provide the name, mailing address, and telephone number of each and every parent or guardian of the babies or fetuses discussed in interrogatory 1, above."
Another request served on March 20, 2007, and entitled, "Plaintiffs' Consolidated Discovery Requests to St. Vincent's Hospital Post AMLA [Alabama Medical Liability Act, § 6-5-480
et seq. and § 6-5-541 et seq., Ala. Code 1975,] Ruling,"[2]
in relevant part, states:
 "1. Please produce complete and unredacted copies of the medical and billing records of those nineteen babies, and their mothers' records, that were held in St. Vincent's Hospital's freezer with [the fetus] and then cremated with him during the summer of 2002 (the `Nineteen babies').
 "2. Please produce copies of the medical and billing records of the Nineteen Babies, and their mothers' records. For this request, but only if St. Vincent's Hospital refuses to fully respond to Interrogatory 1, above, please redact identifying information (names, mailing addresses, telephone numbers, and social security numbers only) thereby protecting the identities of the Nineteen Babies and their parents or guardians. If you have properly produced complete and unredacted documents in response to Interrogatory 1, above, you may disregard this request.
 "3. At any time, were any of the parents or guardians of the Nineteen Babies told that their baby's body would be or was held for a period of time longer than 10 days before being cremated? If so, for each of the Nineteen Babies, please state in detail:
 "(a) List by name and mailing address and date of communication, the complete substance of the communications with each parent or guardian; and
 "(b) The full name, mailing address, telephone number, and title of all persons or entities that communicated with any of the parents or guardians of the Nineteen Babies relating to this subject.
 "4. At any time, were any of the parents or guardians of the Nineteen Babies told that their baby's body would be or was held in St. Vincent's Hospital's morgue's freezer for more than 10 days and up to two years before being cremated? If so, for each of the Nineteen Babies, please state in detail:
 "(a) List by name, mailing address and date of communication, the complete substance of the communications with each parent or guardian; and
 "(b) The full name, mailing address, telephone number, and title of all persons or entities that communicated with any of the parents or guardians of the Nineteen Babies relating to this subject.
 "5. Please produce all correspondence, notes, reports, photographs, investigation records, audio or video recordings, incident reports, and all other items or documents reflecting any communications or agreements with the *Page 206 
Nineteen Babies' parents or guardians related in any way to the testing, cremation, or handling of their babies' bodies, including related billing and collection efforts.
 "6. Please produce all correspondence, notes, reports, photographs, investigation records, audio or video recordings, incident reports, and all other items or documents reflecting any communications or agreements with the Nineteen Babies' parents or guardians after their mothers were discharged from St. Vincent's Hospital through the present.
 "7. For each and every one of the Nineteen Babies that St. Vincent's did not advise the babies' parents or guardians that there would be or was a delay in cremation (more than 10 days from death/delivery), please state each and every reason why St. Vincent's Hospital chose not to notify those parents and guardians of that information.
 "8. For each and every one of the Nineteen Babies that St. Vincent's did not advise the babies' parents or guardians that their baby would be or was held in St. Vincent's Hospital's morgue's freezer for up to two years, please state each and every reason why St. Vincent's Hospital chose not to notify those parents and guardians of that information."
(Emphasis in original.)
St. Vincent's objected to the interrogatories and requests for production. On June 29, 2007, the trial court compelled responses to (1) the Wadleys' request for production no. 29 served on July 2, 2004, [3] (2) interrogatories 1 and 2 of the Wadleys' consolidated discovery request served on November 17, 2004, [4] and (3) requests 1 through 8 of the Wadleys' consolidated discovery request served on March 20, 2007. The trial court's order states:
 "This Court is very concerned about the privacy interests of the parents of those 19 children, and has struggled mightily on this issue. Given that the [Alabama Medical Liability Act] does not apply here, given that the plaintiffs have alleged that there existed a pattern or practice of fraudulent conduct, given that the evidence at issue appears pertinent to that claim, and given our liberal spirit of discovery, this Court must nevertheless conclude that the plaintiffs are entitled to the evidence sought."
On July 18, 2007, St. Vincent's moved the trial court "to enter an order protecting from discovery the protected health information of non-parties requested by plaintiffs' request for production # 29 (dated July 2, 2004), interrogatories # 1-2 (dated December 22, 2004),[5] and requests # 1-8 in plaintiffs' consolidated discovery requests (dated March 22, 2007)." On July 30, 2007, the trial court denied the motion. On August 23, 2007, St. Vincent's filed this petition.
 III. Standard of Review "Mandamus is an extraordinary remedy and will be granted only when there is `(1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, *Page 207 
and (4) properly invoked jurisdiction of the court.' Ex parte Alfab, Inc., 586 So.2d 889, 891
(Ala. 1991). In Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810 (Ala. 2003), this Court announced that it would no longer review discovery orders pursuant to extraordinary writs. However, we did identify four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus. Such circumstances arise (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala. 2001); (b) when a discovery order compels the production of patently irrelevant or duplicative documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So.2d 1135, 1138 (Ala. 1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party's entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court's alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case — that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala. 1992)."
Ex parte Dillard Dep't Stores, Inc., 879 So.2d 1134,1136-37 (Ala. 2003). This case does not fall squarely within any one of the four examples of cases discussed by this Court inEx parte Ocwen Federal Bank, FSB, 872 So.2d 810
(Ala. 2003), in which review by appeal would be inadequate. As this Court stated in Ex parte Crawford BroadcastingCo., 904 So.2d 221, 224 (Ala. 2004), however, the list of examples in Ocwen Federal Bank is not exhaustive. This case presents a situation in which a discovery order compels the production of information that implicates privacy considerations analogous to an evidentiary privilege. Therefore, review by appeal after final judgment would be ineffective in this case, and mandamus review is appropriate.
Pursuant to Rule 21(a)(1)(E), Ala. R.App. P., St. Vincent's, as the petitioner, has the burden of providing this Court with "[c]opies of any order or opinion or parts of the record that would be essential to an understanding of the matters set forth in the petition." St. Vincent's failed to include in the materials submitted with its petition for the writ of mandamus a copy of its answer to the Wadleys' complaint, as last amended. We review the trial court's order on the assumption that St. Vincent's has denied all material allegations of the Wadleys' complaint, as last amended, and has demanded strict proof thereof.
 IV. Analysis
We must determine whether the trial court exceeded its discretion by denying St. Vincent's motion for a protective order regarding the records and the responses to interrogatories the Wadleys sought, which include (1) the logbooks for St. Vincent's morgue and department of pathology without redaction of identifying information, (2) the names, addresses, Social Security numbers, [6] dates of delivery, and dates of death *Page 208 
of all the fetuses that were to be cremated and that were stored in St. Vincent's morgue for more than seven days from January 1, 1999, through December 31, 2003, (3) the names, addresses, and telephone numbers of the parents and guardians of the fetuses that were to be cremated and that were stored in St. Vincent's morgue for more than seven days from January 1, 1999, through December 31, 2003, (4) the medical and billing records of the 19 other fetuses cremated on June 3, 2002, in compliance with the March 20, 2007, request, and (5) the medical records of the mothers of the 19 other fetuses in compliance with the March 20, 2007, request.
The Alabama Rules of Civil Procedure allow broad and liberal discovery. Ex parte O'Neal, 713 So.2d 956, 959 (Ala. 1998). Rule 26(b)(1), Ala. R. Civ. P., allows parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action" and, if the information sought may not be admissible at trial, which is "reasonably calculated to lead to the discovery of admissible evidence." When fraud is alleged, Alabama law is well settled that "the plaintiff is accorded a considerably wider latitude in the discovery process so that he will be able to meet the heavy burden of proof placed on him." Ex parteClarke, 582 So.2d 1064, 1068 (Ala. 1991); see also Pughv. Southern Life Health Ins. Co., 544 So.2d 143, 145
(Ala. 1988) ("[W]here fraud is alleged, we allow a wider latitude in the discovery of evidence."). Specific to the issue in this case, this Court has recognized that, "[i]n fraud cases, where intent, knowledge and scienter constitute essential elements of the offense, evidence of similar frauds and misrepresentations [is] commonly admissible." Dorcal, Inc. v. Xerox Corp.,398 So.2d 665, 671 (Ala. 1981).
 A. Whether the Health Information and Records of the Nonparties Are Privileged
St. Vincent's argues that it has a clear legal right to the writ of mandamus because, it argues, the interrogatories and requests for production of records seek confidential and personal health information of nonparties, which, it argues, is privileged and should be protected. St. Vincent's relies on this Court's recognition in Ex parte Mack, 461 So.2d 799, 801 (Ala. 1984), that "patients enjoy a right to privacy and confidentiality with regard to disclosures made within the doctor-patient relationship." See also Home v. Patton,291 Ala. 701, 287 So.2d 824 (1974). St. Vincent's also asserts that requiring responses to the interrogatories and requests for production constitutes an intrusion into a nonparty's constitutionally protected "zone of privacy."[7]
In Mack, a personal-injury action arising from the defendants' allegedly negligent performance of an abortion at a clinic, the plaintiff petitioned this Court for a writ of mandamus directing the trial court to compel answers to interrogatories requesting the name and address of each person *Page 209 
who had received an abortion at the clinic on the same date as the plaintiff or who was present during the pre-abortion counseling the plaintiff participated in at the clinic.461 So.2d at 800. This Court recognized a patient's right to privacy as to medical information and denied the petition.461 So.2d at 801. It concluded that the trial court did not exceed its discretion by determining that rights to privacy and confidentiality of the clime's patients were "paramount to any gain that might be achieved by the disclosure of the information sought by the petitioner." 461 So.2d at 801.
In light of Mack, St. Vincent's argues that it has a duty to keep its patients' personal-health information confidential and that it would be subject to potential liability based on the breach of this duty if it produces the information sought by the Wadleys. St. Vincent's also notes that the Wadleys seek entire medical records, and it argues that "no good can be advanced by wrongfully breaching [the nonparties'] right to privacy" in this case. Petition at p. 18. Therefore, St. Vincent's contends, this Court should protect nonparty health information as it did in Mack.
To distinguish Mack from the present case, the Wadleys note first that Mack was a negligence case and that it did not involve fraud, suppression, pattern and practice, or punitive damages. The Wadleys then argue that this Court's decision in Mack in fact supports the trial court's order because in Mack this Court recognized that a doctor's duty not to reveal confidences arising from the relationship between a doctor and patient is subject to exception where the interests of the public intervene.461 So.2d at 801. In Mack, this Court recognized that a doctor's duty not to make extrajudicial disclosures of information acquired in the course of the doctor-patient relationship "is not absolute, but subject to certain exceptions where the supervening interests of society or the private interests of the patient intervene." 461 So.2d at 801 (citing Home,291 Ala. 701, 287 So.2d 824).
The Wadleys contend that society has a profound interest in ensuring that hospitals and doctors act both morally and professionally. The Wadleys specifically argue that "the public has an interest in being protected from the wrongful treatment" of fetuses and in being informed of any such wrongful treatment. Accordingly, the Wadleys assert that the discovery they are requesting falls within the societal-interest exception to the general rule that confidential health information of non-parties is protected from discovery.
To determine whether governmental or societal interests justify an intrusion into the right to medical privacy, this Court has weighed the factors established by the United States Court of Appeals for the Third Circuit in United States v.Westinghouse Electric Corp., 638 F.2d 570, 578 (3d Cir. 1980). Middlebrooks v. State Bd. of Health,710 So.2d 891, 892 (Ala. 1998). These factors are:
 "`[T]he type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.'"
710 So.2d at 892 (quoting Westinghouse Elec. Corp.,638 F.2d at 578).
 B. Information Independent of the Disposition of the Fetuses
We pretermit consideration of privacy factors as to the requests for production *Page 210 
of records and interrogatories to the extent they seek information independent of the disposition of the fetuses. The information in the records of the 19 other fetuses and of their parents and guardians concerning matters such as problems with the pregnancy, the mother's health, and the circumstances resulting in the death of the fetus is neither relevant to the Wadleys' allegations nor reasonably calculated to lead to the discovery of admissible evidence. See Rule 26(b)(1), Ala. R. Civ. P.[8] Such evidence has no bearing on the allegations of the Wadleys' complaint dealing only with disposition of the remains of the fetus. The trial court therefore exceeded its discretion in denying St. Vincent's motion for a protective order as to information independent of the disposition of the fetuses.
 C. Information Regarding the Disposition of the 19 Other Fetuses
The trial court, as previously noted, acknowledged that it was "very concerned about the privacy interests of the parents of those 19 children, and has struggled mightily on this issue."[9] Such is also the case with this Court. In balancing the Westinghouse factors, we recognize that the logbooks of the morgue and the department of pathology and the medical and billing records of the 19 other fetuses and their parents and guardians concerning the disposition of the 19 other fetuses after delivery contain extremely sensitive medical information. We also recognize that because of the extremely sensitive nature of the requested information, the "potential for harm in any subsequent non-consensual disclosure" of the information is great. Westinghouse Elec. Corp.,638 F.2d at 578. However, we must balance this factor, "the type of record requested," and "the information [the record] does or might contain" with the other Westinghouse factors, while also considering the general discoverability of the information under Rule 26, Ala. R. Civ. P. Id.
We first note that the unique and egregious nature of the assertions of fraud in this case create a "recognizable public interest militating toward access" because the actions that form the basis of the assertions are so offensive to the morals and dignity of society. Westinghouse Elec. Corp.,638 F.2d at 578. That there is such a public interest is further bolstered by the fact that the rights of privacy the hospital seeks to protect on behalf of the patients, namely, to keep from the patients knowledge of how their fetuses were treated, involve no risk of a chilling effect on a patient's willingness to communicate his or her wishes for the disposition of a fetus to a physician. Thus, the Westinghouse factor of whether an "injury from disclosure to the relationship in which the record was generated" will occur does not weigh in favor of protecting the requested information. Id.
We must also consider the Wadleys' "degree of need for access" to information regarding the disposition of the 19 other fetuses after delivery in light of the Wadleys' fraud and fraudulent-suppression allegations.[10] Westinghouse Elec.Corp., *Page 211 638 F.2d at 578. As noted above, the Wadleys' fraud and suppression counts allege that St. Vincent's had a pattern and practice of not timely cremating such fetuses and holding them in its morgue for unreasonable periods, contrary to alleged representations as to the timing of such activity.
The Wadleys contend that the discovery requests are proper because, they say, the requests are carefully tailored to their fraud and suppression claims. The Wadleys assert that the communications and agreements between St. Vincent's and the parents and guardians of the 19 other fetuses relating to testing and cremation issues is critically necessary to their case and likely to lead to the discovery of admissible evidence. The Wadleys specifically contend that whether St. Vincent's told the parents and guardians of the 19 other fetuses that the fetuses would be stored in the morgue for months and possibly years before they were cremated is relevant to their fraud and fraudulent-suppression claims.
St. Vincent's contends that the responses to the requests for production and the answers to the interrogatories "cannot possibly support" the Wadleys' fraud claims because, it says, there is no evidence indicating (1) that anyone with authority to bind St. Vincent's made any representations to the Wadleys or (2) that the Wadleys relied on any representations made by a party to the case in deciding to request cremation of the fetus. Reply brief at p. 11. St. Vincent's further contends that the Wadleys failed to allege that St. Vincent's did anything to convince or to persuade them to leave the fetus's remains for cremation. Thus, St. Vincent's argues that the information at issue is patently irrelevant to this case. However, at this stage of the proceeding, where we have before us only the allegations of the complaint, St. Vincent's has no clear legal right to a determination that the trial court exceeded its discretion in allowing discovery, thereby cutting off a plaintiffs right to discovery based on a defendant's contentions as to the absence of evidence.
We also note that St. Vincent's argues that "[t]he non-party medical records which St. Vincent's has been ordered to producelikely contain little or no detailed information regarding any conversations between the healthcare providers and the non-parties concerning the disposition of their fetal remains." Reply brief at p. 4 (emphasis added). However, St. Vincent's assertion that the compelled discovery isunlikely to provide relevant information is not dispositive of the Wadleys' right to discover the information. Discovery matters are within a trial court's sound discretion, and this Court will grant a petition for a writ of mandamus curtailing a discovery order only if the trial court clearly exceeded its discretion in issuing the order. Ex parte OcwenFed. Bank, 872 So.2d at 813.
We conclude that the information contained in the logbooks of the morgue and pathology department and records of the 19 other fetuses and their parents and guardians regarding the disposition of the fetuses after delivery falls within an exception to a patient's right to confidentiality because of the supervening societal interest, recognized in Mack, in knowledge of a hospital's practices regarding the disposition of fetuses after delivery and the availability of avenues of discovery in a fraud case based on such activities. In light of the discretion granted to a trial court regarding discovery matters and the wide latitude allowed for discovery when fraud is alleged, we further conclude that the trial court did not exceed its discretion in denying St. Vincent's motion for a protective order regarding the logbooks and records, to the extent that those records relate to the disposition of the 19 other fetuses, *Page 212 
because those records may assist the Wadleys in proving their fraud and fraudulent-suppression claims. Ex parte AllstateIns. Co., 401 So.2d 749, 751 (Ala. 1981) ("Evidence of similar misrepresentations made to others by the defendant is admissible in a fraud action. . . . Therefore, the information sought . . . could very easily lead to admissible evidence.").
We thus conclude that the trial court did not exceed its discretion in denying St. Vincent's motion for a protective order that would have precluded production of records and responses to interrogatories, which include (1) the logbooks for St. Vincent's morgue and department of pathology without redaction of identifying information, (2) the names, addresses, Social Security numbers, dates of delivery, and dates of death of all the fetuses that were to be cremated and were stored in St. Vincent's morgue for more than seven days from January 1, 1999, through December 31, 2003, (3) the names, addresses, and telephone numbers of the parents and guardians of the fetuses that were to be cremated and that were stored in St. Vincent's morgue for more than seven days from January 1, 1999, through December 31, 2003, (4) the medical and billing records of the 19 other fetuses to the extent the records concern the disposition of the fetuses, and (5) the medical records of the mothers of the 19 other fetuses to the extent the records concern the disposition of the fetuses.
We invite the trial court to consider using a neutral intermediary, such as the trial court itself, a court official, or other appropriate person, to notify, to the extent practicable, the persons named in the records of the pendency of this action, of the order of the trial court compelling disclosure, and of the action of this Court, preliminary to producing these records for the Wadleys. The Court makes this suggestion solely for the humane purpose of giving the persons named in the records an opportunity to be apprised of the extremely sensitive facts underlying the litigation and the fact of the impending production of the records before those persons are contacted by the Wadleys in pursuit of further discovery.
 V. Conclusion
We grant the petition in part and deny it in part. We direct the trial court to vacate its order of July 30, 2007, insofar as it denied a protective order providing relief from responding to requests for production and interrogatories related to information concerning the mothers' pregnancies and the death of the fetuses to the extent that this information does not deal with disposition of the remains of the fetuses. In all other respects, we deny the petition.
APPLICATION OVERRULED; OPINION OF FEBRUARY 1, 2008, WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
COBB, C.J., and SEE, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the result.
[1] From the materials before us on this petition for the writ of mandamus it is unclear whether the nurse's notes were written in Wendy's medical records or in the medical records related to the fetus.
[2] The trial court issued a ruling that the Alabama Medical Liability Act did not apply to this case.
[3] Request for production no. 29 requested "copies of any and all pathology or morgue log books or sign-in records (however designated) for the month of December 2000."
[4] The trial court's order describes these interrogatories as having been served on December 22, 2004; the correct date is November 17, 2004, and the responses, claiming that the information is privileged and immaterial and irrelevant to this cause, were served on December 22, 2004.
[5] See note 4, ante.
[6] It is unclear from the materials before us on this petition for the writ of mandamus whether any of the fetuses related to this request lived long enough to be issued a Social Security number.
[7] St. Vincent's also contends that production of the information is prohibited because § 6-5-551, Ala. Code 1975, prohibits parties from conducting discovery regarding any other act or omission. However, § 6-5-551 is a part of the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-541
et seq., Ala. Code 1975 ("the AMLA"), and the trial court has ruled that the AMLA does not apply to this case. St. Vincent's does not challenge the trial court's determination as to the AMLA in this proceeding. An earlier attempt to obtain interlocutory review by permissive appeal of the trial court's order holding that the AMLA is not applicable in this case was denied by this Court. See Ex parte St. Vincent's Hosp.
(No. 1051597, September 22, 2006).
[8] "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."
[9] Order of June 29, 2007.
[10] The trial court noted in its June 29, 2007, order that St. Vincent's acknowledged the potential relevance of this evidence in the context of punitive damages on the issue of reprehensibility.