

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-1995

# John Doe, a SEPTA employee v. SEPTA and Pierce

Precedential or Non-Precedential:

Docket 95-1559

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"John Doe, a SEPTA employee v. SEPTA and Pierce" (1995). *1995 Decisions*. Paper 320.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/320

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

NO. 95-1559

JOHN DOE, a SEPTA employee,
                    Appellee,

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA), and JUDITH PIERCE
individually and in her official capacity,
Appellants.


Appeal from the Orders of the United States Court for the Eastern District of Penns
D.C. No.  93-cv-5988



Argued October 11, 1995
Before:   Greenberg, Lewis and Rosenn, <u>Circuit Judges</u>

Opinion Filed December 28, 1995


Clifford A. Boardman (argued)
Two Penn Center, Suite 1920
Philadelphia, PA 19102

Yolanda Lollis
AIDS Law Project of Pennsylvania
1211 Chestnut St., 12th Floor
Philadelphia, PA  19107
Counsel for Appellee

J. Freedley Hunsicker, Jr. (argued)
Drinker, Biddle & Reath
1345 Chestnut Street
Philadelphia, PA  19107-3496
Counsel for Appellants



OPINION OF THE COURT



**ROSENN**, <u>**Circuit Judge**</u>.

This appeal requires that we probe the depth and breadth of an employee's

conditional right to privacy in his prescription drug records.  John Doe, an employ

2

the Southeastern Pennsylvania Transportation Authority (SEPTA)[1], initiated this act

under 42 U.S.C. § 1983 against his self-insured employer, alleging that the defenda

violated his right to privacy. Plaintiff claims that, in monitoring the prescriptio

program put in place by SEPTA for fraud, drug abuse and excessive costs, the Chief

Administrative Officer, Judith Pierce, and the Director of Benefits, Jacob Aufschau

learned that John Doe had contracted Acquired Immunodeficiency Syndrome (AIDS).  Th

alleges, invaded his right to privacy.

A jury found for the plaintiff and awarded him $125,000 in compensatory damag

his emotional distress.  The trial court denied defendants' motion under Rule 50 fo

judgment as a matter of law, or alternatively for a new trial.  The court also deni

defendants' motion for a reduction in damages.  The defendants timely appealed.  We

reverse.

I.

We set forth the facts as the jury could have found them in support of its ve

Accordingly, all evidence and inferences therefrom must be taken in the light most

favorable to the verdict winner.  See Parkway Garage, Inc. v. City of Philadelphia,

685, 691-92 (3d Cir. 1993)(as amended on petition for rehearing).  In 1990, Judith

became the Chief Administrative Officer for SEPTA.  Her responsibilities included

containing the costs of SEPTA's self-insured health program.  In 1992, a collective

bargaining agreement with Local Union 234 required SEPTA to provide, inter alia,

prescription drugs for the employees.  SEPTA entered into a contract with Rite-Aid

Store to be the sole provider for all of SEPTA's prescription drug programs.  As pa

---

[1]SEPTA is a public transportation authority operating mass transportation facilitie
the five-county Philadelphia metropolitan area.  It operates subways, railroads, bu
and trackless trolleys and maintains stations, depots, and other installations.  Se
Transport Workers' Local 234 v. SEPTA, 863 F.2d110, 1113 (3d Cir. 1989).  SEPTA rec
much of its operating funds from state and federal subsidies.  It is an agency of t
Commonwealth of Pennsylvania.  Id., at 1113.  The parties agree that all actions ta
Pierce relevant to this matter were part of her job as a policy-maker at SEPTA. The
Doe's suit is proper under Section 1983.

this contract, Rite-Aid provided SEPTA with an estimate of the yearly costs of this program.  If, at the end of the year, the actual cost to Rite-Aid amounted to over that estimate, SEPTA would have to pay substantial penalties; however, if the actual was 90% or less of that estimate, SEPTA would be entitled to rebates.  Pierce was responsible for monitoring those costs.

John Doe is a SEPTA employee.  At all times relevant to this appeal, Doe was positive, and had contracted AIDS by the time of trial.  In 1991, Doe began to take Retrovir for his condition.  Retrovir is a prescription drug used solely to treat H Before filling his prescription, Doe asked Dr. Richard Press, the head of SEPTA's M Department and Doe's direct supervisor, if he or anyone else reviewed employee name association with the drugs the employees were taking.  Doe wished to keep his condi secret from his co-workers.  Dr. Press assured Doe that he had only been asked to r names on prescriptions in cases of suspected narcotics abuse and knew of no other r that included names.  After receiving this information, Doe filled his prescription through the employer's health insurance.  He continued to do so after SEPTA switche Rite-Aid; he was never informed that this change might alter his confidentiality st

In November of 1992, Pierce requested and received utilization reports from R Aid.  These reports were part of the contract between Rite-Aid and SEPTA.  Pierce d request the names of SEPTA employees in the reports, and Rite-Aid sent the reports their standard format.  They included statistics on the number of employees with f more prescriptions dispensed in a one-month period, the top 25% by cost of drugs bo SEPTA employees, and the report at issue here.  This report listed employees who we filling prescriptions at a cost of $100 or more per employee in the past month.  Ea of the report included the name of an employee or dependent, a code to identify the prescribing doctor, the dispense date of the prescription, the name of the drug, th number of days supplied, and the total cost.  Pierce called Aufschauer into her off and the two of them reviewed the report.  It was immediately apparent to Pierce tha

4

reports would reveal employees' medications; however, she reviewed them in the form

submitted.  She did not at that time request Rite-Aid to redesign SEPTA's reports t

encode employees' names.

Pierce stated that her purpose in reviewing the reports with Aufschauer was s

fold.  First, she wanted to look for signs of fraud and drug abuse.  She testified

in the past, some employees would purchase prescription drugs under the SEPTA healt

in order to give them to an ill friend or relative who was not covered by SEPTA's h

package.  Second, Pierce wanted to determine if Rite-Aid was fulfilling its promise

generic rather than brand name drugs whenever possible.  Third, although they were

covered in the Rite-Aid contract, Pierce wanted to determine the cost to SEPTA of

fertility drugs and medications to help employees stop smoking, such as nicotine pa

Finally, Pierce wanted to determine whether the reports were in a summary form and

they would permit an audit. Her review, however, focused almost entirely on the cu

report, which included employees' names.  She also testified that people who had se

report, she, Aufschauer, and Dr. Press "were very careful to maintain the confident

of the people."

Pierce and Aufschauer scanned the reports.  When they came across a drug name

neither one recognized, they would look it up in a Physician's Desk Reference (PDR)

Pierce had.  Pierce then called Dr. Louis Van de Beek, a SEPTA staff physician, and

inquired about the drugs not listed in the PDR.  She asked the doctor for what Retr

was used.  When Dr. Van de Beek told her it was used in the treatment of AIDS, she

inquired whether there was any other use for it.  He told her no.  She then asked a

the three other medications that Doe was taking, and was informed that they were al

medications as well.  Pierce discreetly never mentioned Doe by name; however, Dr. V

Beek was aware of Doe's condition and Doe's medications because Doe himself had dis

this information to him.  Therefore, Dr. Van de Beek deduced that Pierce was asking

Doe.  He told her that if she were trying to diagnose employees' conditions through

5

prescriptions, he felt this was improper and possibly illegal. Pierce immediately e

the conversation and told him not to speak of the conversation to anyone.

Pierce then took the report to Dr. Press. She asked him if he would be able

perform an audit using the information in the report. Press noted that Pierce had

highlighted certain lines on the report, including employees' names and the drugs t

each of those highlighted employees were taking. Press testified that the drugs

highlighted were all HIV or AIDS-related. Pierce asked Press if he knew whether ar

the people whose names were highlighted were HIV-positive. Press said that he was

of Doe's condition. He then told Pierce that he was uncomfortable with the presenc

the names on the report. He also told her that he had neither the expertise nor th

resources to perform an audit.

Dr. Press then approached James Kilcur, the General Counsel of SEPTA, and exp

his concern about the names on the report. Kilcur called Pierce and asked her whet

names were necessary for her purposes. She replied that they were not and then des

the report. SEPTA then instructed Rite Aid to submit all future reports without na

Dr. Van de Beek informed Doe of Pierce's questions. He told Doe that Pierce

likely found out that Doe was HIV-positive. Doe claims he became upset at this new

avers that he became more upset upon discovering from Dr. Press that Pierce had his

highlighted on a list because he didn't know who had access to or had seen this "AI

list" and only a few SEPTA employees knew of his HIV-status. He had told Press and

Beek, as well as his acting supervisor and the administrative assistant of his depa

that he had AIDS. He testified that these were all people he trusted to keep this

information confidential, and he wanted to explain to them his need for periodic le

absence. He did not want Pierce to know of his condition.

After these incidents, Doe remained at SEPTA in his current position. He mak

claim of personal discrimination or of any economic deprivation. He later received

salary upgrade and promotion. However, he testified that he felt as though he were

6

treated differently.  A proposal he had made for an in-house employee assistance pr

met with scant interest; he felt that this was because of his HIV condition.  In ac

an administrator who reported to Pierce did not call on Doe to assist in the same w

he had called on Doe earlier.  Doe testified that he felt as though there was less

chitchat, co-workers ate less of the baked goods he brought to the office to share,

that his work space seemed more lonely than before. He also became fearful of Pierc

never told Doe that she knew of his illness.  Doe alleges that he became depressed

requested a prescription for Zoloft, an antidepressant, from his physician.  Later,

another antidepressant called Elavil was added to the medications Doe was taking.

Doe filed suit in the United States District Court[2] against Pierce in both her

individual and official capacities, and against SEPTA.  Defendants moved for summar

judgment on the grounds that Doe had no right to privacy in the information contain

the Rite Aid report; that if he did have such a right it had not been violated beca

disclosure had occurred; and that any interest Doe might have in the privacy of the

records was outweighed by their legitimate interests in the information.  These arg

were rejected by the district court, which denied their motion.

After a jury trial, defendants moved under Rule 50 for judgment as a matter o

or, alternatively, for a new trial under Rule 59.  They also moved for a reduction

damages on the grounds that Doe had not proved emotional distress as a result of

defendants' actions.  The judge granted their motion as to plaintiff's failure to t

claim[3], but in all other respects rejected the defendants' motions.

II.

---

[2]Doe also filed a related suit against Rite-Aid and its employees in a Philadelphia
of Common Pleas.  That case was settled late in 1994, when Rite-Aid agreed to modif
billing procedures in the state of Pennsylvania in order to prevent these disclosur
the future.  See 22 BNA Pension and Benefits Reporter 33 (Jan. 2, 1995).
[3]This ruling is not before us, as it has not been appealed.

The issues raised here present questions of constitutional law. Because this [case] comes to us on appeal from an order denying a motion for judgment as a matter of la[w,] review is plenary. <u>Epstein v. Kmart Corp.</u>, 13 F.3d 762 (3d Cir. 1994); <u>Cole v. Fl[ ]</u> 758 F.2d 124 (3d Cir.), <u>cert. denied</u>, 106 S.Ct. 253 (1985).

As a preliminary matter, this court must decide if a person's medical prescri[ption] record is within the ambit of information protected by the Constitution. If there [is no] right to privacy, our inquiry stops. A § 1983 action cannot be maintained unless t[he] underlying act violates a plaintiff's Constitutional rights. Minor annoyances do n[ot make] a federal case. When the underlying claim is one of invasion of privacy, the comp[laint] must be "limited to those [rights of privacy] which are `fundamental' or `implicit [in the] concept of ordered liberty'..." <u>Paul v. Davis</u>, 424 U.S. 693, 713, <u>reh'g. denied</u>, 4[25 U.S.] 985 (1976), <u>citing</u> <u>Palko v. Connecticut</u>, 302 U.S. 319, 325 (1937).

Medical records fall within this scope. The Supreme Court, in <u>Whalen v. Roe</u>, [429] U.S. 589 (1977), noted that the right to privacy encompasses two separate spheres. [One of] these is an individual's interest in independence in making certain decisions. The [other] is an interest in avoiding disclosure of personal information. <u>Whalen</u>, at 599-600. Medical records fall within the second category. <u>Id</u>. Therefore, the Court held th[at] individuals do have a limited right to privacy in their medical records. <u>Id.</u> at 6[00.]

This court reinforced this holding through our decision in <u>United States v. </u> <u>Westinghouse Elec. Corp.</u>, 638 F.2d 570 (3d Cir. 1980). In that case, the federal government, through the Occupational Safety and Health Agency (OSHA), issued a subp[oena] duces tecum to an employer for its employees' medical records in connection with an investigation of a potentially hazardous work area. The employer refused, asserti[ng the] privacy interests of its employees. This court held that, on balance, the interest [of] the government in the information outweighed these privacy interests; however, they [also] recognized that such records were deserving of a level of constitutional protection[:] "There can be no question that an employee's medical records, which may contain int[imate]

8

facts of a personal nature, are well within the ambit of materials entitled to priv

protection." Westinghouse, at 577.

The records at issue in Westinghouse included "results of routine testing, su

X-rays, blood tests, pulmonary function tests, hearing and visual tests." Id. at 5

these records are private, then so must be records of prescription medications. Sir

Westinghouse decision fifteen years ago, medical science has improved and specializ

medications. It is now possible from looking at an individual's prescription recor

determine that person's illnesses, or even to ascertain such private facts as wheth

woman is attempting to conceive a child through the use of fertility drugs. This

information is precisely the sort intended to be protected by penumbras of privacy.

Eisenstadt v. Baird, 405 U.S. 438, 450 (1972)("If the right of privacy means anythi

is the right of the individual...to be free from unwanted governmental intrusions i

matters so fundamentally affecting a person as the decision whether to bear or bege

child."). An individual using prescription drugs has a right to expect that such

information will customarily remain private. The district court, therefore, commit

error in its holding that there is a constitutional right to privacy in one's presc

records.

III.

Such a right is not absolute, however. See Whalen v. Roe, 429 U.S. at 602 (w

individuals have a legitimate expectation of privacy in their prescription purchase

controlled substances, such right must be weighed against the state's interest in

monitoring the use of dangerously addictive drugs).

> [D]isclosures of private medical information to doctors, to hospital personne
> insurance companies, and to public health agencies are often an essential par
> modern medical practice even when the disclosure may reflect unfavorably on t
> character of the patient.

Id. In addition, disclosure of private medical information is necessary for the ph

filing the prescriptions. The Court also cited examples of statutory reporting

9

requirements relating to various diseases, child abuse, injuries caused by deadly w

certifications of fetal death, and the recordkeeping requirements of Missouri abort

laws. Id. n. 29. As with many individual rights, the right of privacy in one's

prescription drug records must be balanced against important competing interests.

Before we can perform this balancing test, we must first assess whether, and

extent, Pierce disclosed Doe's prescription drug information. Obviously, no privac

violation would have taken place had the information from Rite-Aid come in encoded

A self-insured employer has a right to monitor the use and cost of its health insur

plan. SEPTA's status as a public authority substantially dependent on the public f

the rates the public must pay to use its facilities converts this right into a duty

Audits of drug information are essential to that end. In the aggregate, there is

competing privacy interest in those records. Doe would have no cause of action if

that had been disclosed were that an unknown number of people at SEPTA were purchas

Retrovir for the treatment of HIV-related illnesses. Therefore, such disclosure as

occurred came only when Doe's name was revealed with respect to his purchase of dr

under SEPTA's prescription drug program.

Both Pierce and Aufschauer learned of Doe's illness through the Rite-Aid repo

Pierce's initial discovery of the names on the report was inadvertent. She had not

requested names from Rite-Aid and there is no evidence that she expected to find th

she opened their standard report. This alone would not be sufficient to prove a

constitutional violation for disclosure.[4] However, Pierce then spent some time and

researching the report with the names on it. She highlighted, for her research pur

those names on the report whose medications she was unfamiliar with and which were

expensive, including Doe's, and called two SEPTA staff physicians to ask about medi

---

[4]We need not discuss in this case any possible violation on the part of Rite-Aid fo
preparing such a report. See supra, n.2.

she did not recognize.  It was through this inquiry that Pierce learned about Doe's

condition.  She did not know the uses of Retrovir before she did this research.

Aufschauer learned of Doe's condition through his work as Director of Benefit

Pierce's subordinate.  Pierce disclosed the information to him in the course of the

work.  SEPTA argues that this disclosure was necessary, as Aufschauer also had reas

needing this information.  Aufschauer's legitimate need for this information may af

whether the disclosure is an actionable one.  It does not alter the existence of

disclosure.

Nor can Pierce and Aufschauer be considered as a single unit for the purpose

determining disclosure.  A disclosure occurs in the workplace each time private

information is communicated to a new person, regardless of the relationship between

co-workers sharing that information.  By analogy, district courts in this circuit h

held that there is publication, such that a libel or slander is actionable, when th

defamatory statement is disclosed only to the speaker's agent. Elbeshbeshy v. Frank

Institute, 618 F.Supp. 170 (W.D. Pa. 1985).  Therefore, we hold that each person wh

learned of Doe's condition constitutes a separate disclosure for the purposes of Do

invasion of privacy action.

To hold differently would lead us to a decision that Doe had waived his right

privacy by voluntarily disclosing his medical condition to co-workers at SEPTA.  We

not faced with a situation where persons to whom Doe disclosed this information tol

others.  Rather, Pierce and Aufschauer learned his condition completely independent

Doe's disclosures.  His decision to give private information to some co-workers doe

give carte blanche to other co-workers to invade his privacy. See Laurence Tribe,

American Constitutional Law, 2d ed., at 1391 ("[W]hat could be more commonplace tha

idea that it is up to the individual to measure out information about herself

selectively[?]....[A] secret remains a secret even when shared with those whom one

for one's confidences.")

11

However, we are not persuaded that the impingement on Doe's privacy by the disclosure to SEPTA's Chief Medical Officer, Dr. Press, amounts to a constitutional violation. Doe himself had already voluntarily informed Dr. Press of his condition Press did not learn any new information from Pierce's actions. Plaintiff asserts th Van de Beek, as well, learned of the information from Pierce. Van de Beek, like Dr Press, had already heard of Doe's condition from Doe himself. Moreover, Pierce did disclose Doe's name to Van de Beek. She asked him about medications, and he deduce she was asking about based on his independent knowledge of Doe's condition. It str any theory of liability far too thin to base an invasion of privacy on such conduct Therefore, there was no disclosure to Dr. Van de Beek. Also, as a matter of law, t cursory disclosure Pierce made to Dr. Press, chief of SEPTA's medical department, a physician, and largely responsible for the health of SEPTA's employees, did not "am an impermissible invasion of privacy," <u>Whalen v. Roe</u>, 429 U.S. at 602, because John had already provided him with this information. Pierce and Aufschauer are the only disclosures to be weighed and balanced.

IV.

As we noted earlier, an individual's privacy interest in his or her prescript records is not an absolute right against disclosure. This interest must be weighed against the interests of the employer in obtaining the information. We apply an intermediate standard of review in making this determination. <u>Fraternal Order of Po Lodge 5 v. Philadelphia</u>, 812 F.2d 105, 110 (3d Cir. 1987)(hereafter <u>FOP</u>). <u>FOP</u> also that the more stringent "compelling interest analysis" would be used when the intru an individual's privacy was severe. We are not faced with such a situation here. intrusion upon Doe's privacy was minimal at worst.

This court has previously enumerated the factors to be weighed in determining whether a given disclosure constitutes an actionable invasion of privacy in <u>United</u> v. <u>Westinghouse Electric Corp.</u>, 638 F.2d 570 (3d Cir. 1980). In <u>Westinghouse</u>, the

12

government, through OSHA, served a subpoena duces tecum on Westinghouse for its emp

medical records in connection with an investigation concerning a possible health ha

the workplace. Westinghouse, as employer, moved to quash the subpoena, asserting,

tertii, its employees' rights of privacy in those records. Here, in contrast, SEPT

the employer, who legitimately sought prescription information to ascertain whether

were abuses of its health program, either by the supplier or the consumer/employee.

Moreover, the remedy sought for the alleged invasion here is damages rather than a

quashing of a subpoena. However, the Westinghouse factors are still good law, and

equally applicable to this situation.

Westinghouse mandates a consideration of seven different factors. They are:

type of record requested; (2) the information it does or might contain; (3) the pot

for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure

relationship in which the record was generated; (5) the adequacy of safeguards to p

unauthorized disclosure; (6) the degree of need for access; and (7) whether there i

express statutory mandate, articulated public policy, or other recognizable public

interest favoring access. Westinghouse, 638 F.2d at 578. Although some of these fa

may be in Doe's favor, overall, we believe the balance weighs on the side of permit

the disclosures present here. There is a strong public interest of the Transportat

Authority, and the many thousands of people it serves, in containing its costs and

expenses by permitting this sort of research by authorized personnel. This interes

outweighs the minimal intrusion, particularly given the lack of any economic loss,

discrimination, or harassment actually suffered by plaintiff.

The type of record requested here was the first print-out of prescription

medications furnished by SEPTA to its employees under its contract with the supplie

Rite-Aid. No particular format and no names were requested. The information which

expected it to contain was nothing more than a record of the drugs on which SEPTA h

spent over $100 in a given month per individual. However, Rite-Aid, on its own

13

initiative, included in its format the names of each person taking those drugs.  As discussed above, this inadvertently-received information is entitled to a measure o confidential protection.

In addition, we recognize the possible harm to Doe from disclosure.  The dist court of New Jersey, in Doe v. Borough of Barrington, 729 F.Supp. 376 (D.N.J. 1990) recognized the social stigma, harassment, and discrimination that can result from p knowledge of one's affliction with AIDS.  Id. at 384, n.8.  It is unfortunate that understanding of this disease has changed so little in the intervening years.  Alth AIDS hysteria may have subsided somewhat, there still exists a risk of much harm fr consensual dissemination of the information that an individual is inflicted with AI

This potential for harm, however, should not blind us to the absence of harm case.  Despite Pierce's disclosures to her subordinate, Aufschauer, and to Dr. Pres Doe had AIDS, SEPTA promoted him and still retains him in his responsible position. Doe v. Borough of Barrington, a borough police officer, without justification, tol neighbors of a man suffering from AIDS that the entire family had AIDS.  The neighb reacted by organizing a protest, and trying to prevent the man's children from atte public school.  In that case, the court quite rightly held such conduct violated th plaintiffs' privacy rights, and there was no competing interest to justify the disc

By contrast, SEPTA had legitimate reasons for obtaining the prescription info from Rite-Aid.  Pierce had requested the information in Rite-Aid's standard format; did not request the names of any employees.  She did not disclose the information r to Doe except to Aufschauer, in connection with their review, and to Dr. Press, fo purposes of an audit.  Dr. Press, the Chief Medical Officer, already knew of Doe's condition through Doe's voluntary disclosure.  Moreover, Pierce destroyed the first report.  Under these circumstances, we cannot conclude that Westinghouse factor (3) impose liability on SEPTA. Although the factor appears to address potential harm, s potential harm must be measured within the context of the disclosure that actually

14

occurred.  The potential for harm from a different disclosure of this information,

different circumstances, as in Westinghouse, is not germane here.

The record was generated from the relationship between Doe and Rite-Aid, thro

filling of the prescription.  It is difficult to see how this relationship is affec

Rite-Aid's subsequent generating of reports to Doe's employer.  Doe is no doubt awa

insurance companies and providers such as Medicare and Medicaid routinely receive

information from drugstores about prescriptions charged to them by the insured. Sel

insured employers have the same rights as those providers to similar information.

did not expect that SEPTA would be given access to the names of employees filling

prescriptions; however, the harm from this to the Doe-Rite-Aid relationship is non-

existent.  Once Pierce realized the potential for harm inherent in a report with na

she instructed Rite-Aid that the format for all future reports should be without na

Rite-Aid agreed to comply.  Rite-Aid's relationship with SEPTA employees will conti

unchanged.

Judge Greenberg is of the opinion that the "injury from disclosure" would see

apply to the relationship between Doe and his employer, not between Doe and Rite-Ai

Thus, he believes that the injury from disclosure to the relationship in which the

was generated could obviously be much greater, if the relevant relationship is betw

employer and employee.  He concludes, therefore, that factor four may have weighed

favor of Doe in the jury's analysis.  However, it must be borne in mind that, even

injury from disclosure was to the relationship between Doe and SEPTA, it is undispu

that he suffered no economic deprivation, nor any discrimination, nor harassment.

should also be noted that Judge Greenberg nonetheless believes that, because of our

conclusion regarding Westinghouse factors six and seven, Doe cannot recover.

Factors six and seven strongly favor the defendants. Pierce had a genuine,

legitimate and compelling need for the document she requested.  Aufschauer, as Dire

Benefits, also had a need for the document.  Each had a responsibility and obligati

15

keep insurance costs down and to detect fraudulent and abusive behavior.  The repor[...]

intended for that purpose. Employers have a legitimate need for monitoring the cost[...]

uses of their employee benefit programs, especially employers who have fiscal

responsibilities, as does SEPTA, to the public.  As health care costs rise, as they[...]

in recent years, and employers become obligated to expand employee coverage with gr[...]

protection for more illnesses and health conditions, health care costs become a maj[...]

concern for employers as well as for Congress.  Ten years ago, health insurance was[...]

among the top concerns of small businesses; today it is number one.  Note, "Health [...]

Cost-Containment and Small Businesses: The Self-Insurance Option, " 12 J.L. & Com. [...]

(1993).  In recent years many industrial strikes have been motivated by the cost of[...]

benefits sought by employees.  One of the best ways to monitor these costs is by

performing audits on the use to which health plans are being put, and by closely

monitoring the use of drugs.    Employers also have a right to ensure that their h[...]

plan is only being used by those who are authorized to be covered.  Finally, the em[...]

have a right to contain costs by requiring that employees use generic drugs rather [...]

brand name when an adequate substitute exists.  To accomplish these goals, employer[...]

have access to reports from their prescription suppliers, and they must inspect and[...]

those reports.  That is precisely what Pierce and Aufschauer were engaged in, and t[...]

a legitimate function of their positions.  They had a legitimate need for access to[...]

information from the drug supplier, and they carefully controlled its use.

Because SEPTA is an agency subsidized by the state and federal government, it[...]

operating costs are substantially borne by the public who use its facilities and th[...]

taxpayers who pay its subsidies.  Keeping fares and taxes low, and preserving the p[...]

fisc are genuine, recognizable public interests. Therefore, Pierce's need for acces[...]

factor six of Westinghouse, also articulates a recognizable public policy encouragi[...]

access, as noted in factor seven.

16

As Chief Administrative Officer for SEPTA, Pierce had responsibility for heal costs. Her ability over a period of three years to successfully reduce prescripti and dental costs by a combined total of over $42,000,000 gives us some idea of the immensity of her task and the money at stake. The new contract between SEPTA and R gave strong financial incentives to cut costs if possible. There can be no serious argument that Pierce could do this monitoring without being able to audit reports o actual costs and the drugs purchased. It is true that the names of the individual employees were unnecessary for this purpose.[5] It is equally true that Pierce did n request such names, nor did she disclose those names, or any of the information con in the report, in anything other than a legitimate manner. Except for Dr. Press, w the information directly from Doe, the only other person to whom Pierce disclosed t information was Aufschauer. As they requested only information for which they had legitimate and compelling need, and used the information received in a legitimate, and confidential manner, it cannot be said that they violated Doe's right to privac merely because the first report from Rite-Aid contained unnecessary, unrequested information in which he had a privacy interest.

Factor five, however, requires a slightly more complex analysis. It requires weigh "the adequacy of safeguards to prevent unauthorized disclosure." As discusse above, there was no unauthorized disclosure. However, as SEPTA was unaware that th would receive such confidential information, and this was their first experience un Rite-Aid contract, there were no safeguards in place.

In FOP, supra, the Philadelphia police department required applicants to the Investigative Unit (SIU) to complete questionnaires, which asked for extremely priv

---

[5]There may be situations not before us now where an employer who pays for prescripti benefits for employees or their dependents may need to know the identity of a perso obtaining the prescriptions or benefits. After all, an employer might need this information to determine whether the person obtaining the prescriptions or benefits eligible for them, or if the person was even an employee. Of course, such need to would have to comply with the employee's right of privacy as well.

17

information. Police officers sought an injunction against its use.  One grouping of

questions focused on the medical history of the applicant and his family, asking fo

information as physical disabilities, prescription drug use, and past psychological

histories.  FOP, 812 F.2d at 112.  Although noting that, in most cases, this privat

information was irrelevant to the selection of SIU forces, the court also recognize

in some cases, these questions would reveal information essential to the police

department.  Id. at 113.  Therefore, the court permitted the City to ask these ques

of all applicants.

However, the court expressed concern with the absence of protection of this

information.  It noted that "there is no statute or regulation that penalizes offic

with confidential information from disclosing it."  Id. at 118.  As a result, the c

remanded to the district court with directions to continue the injunction until the

the Commissioner, or other appropriate official establishes written, explicit and b

rules that contain adequate safeguards against unnecessary disclosure of the confid

information..."  Id.

Were the case before us now also a request for an injunction, and had SEPTA

requested the broad information required by the Philadelphia police department, we

have similar concerns.  This case, however, is a suit for damages and the informati

disclosed did not have the breadth requested by the Philadelphia SIU.  Doe did not

to enjoin further dissemination by SEPTA, although he is still employed by it. Inde

such a suit would have been moot at its inception.  SEPTA has established an adequa

safeguard against a recurrence of unnecessary disclosure by requesting that Rite-Ai

longer send such confidential information.  Should such information become necessar

some future time, for instance, should names be needed for a more extensive investi

as a result of an initial audit, it can be expected that "written, explicit and bin

rules" would be promulgated before such information is requested.  But it is an

unnecessary burden to require that they be announced when the employer has no knowl

18

that it will be in receipt of the sort of information that requires these safeguar[ds]. Unlike the defendant in FOP, Pierce and SEPTA did not request such information as w[ould] put them on notice that they would need to pre-arrange for its confidential handlin[g.] Thus, we perceive no violation of the Westinghouse fifth factor.

We hold that a self-insured employer's need for access to employee prescripti[on] records under its health insurance plan, when the information disclosed is only for [the] purpose of monitoring the plans by those with a need to know, outweighs an employee['s] interest in keeping his prescription drug purchases confidential. Such minimal int[rusion,] although an impingement on privacy, is insufficient to constitute a constitutional [privacy] violation. The district court should have granted defendants' Rule 50 motion for [judgment] as a matter of law.

## V.

In light of the conclusion we reach that the defendants did not violate plain[tiff's] right of privacy, we need not decide whether the plaintiff's testimony alone of his [self-] diagnosis and subjective impressions can support a finding of damages for emotional distress.[6] See Spence v. Board of Education of Christina School District, 806 F.2d 1201 (3d Cir. 1986).

## VI.

SEPTA demonstrated important interests in the prescription information furnis[hed by] its supplier, and disclosed such information only to people with a right to know. [This] outweighs the minimal intrusion into Doe's privacy. The district court erred in it[s] analysis of the Westinghouse factors, and should have granted defendant's motion f[or] judgment under Rule 50.

---

[6]Plaintiff admits that he suffered no economic damages or physical injury from SEPT[A's] actions. He was not fired or demoted. Emotional distress, therefore, is Doe's onl[y] possible basis for recovery.

Accordingly, the judgment of the district court will be reversed, and the mat

will be remanded to the district court for entry of judgment for the defendants as

matter of law. Each side to bear its own costs.

Doe v. SEPTA

No. 95-1559

GREENBERG, Circuit Judge, concurring.

Although I agree with Judge Rosenn's conclusions, I have a few reservations a
his opinion that I note here.

First, regarding our standard of review:  as Judge Rosenn indicates, after a
verdict, the court cannot substitute its view of the evidence for that of the jury;
accordingly, all evidence and inferences therefrom must be taken in the light most
favorable to the verdict winner.  See Parkway Garage, Inc. v. City of Philadelphia,
685, 691-92 (3d Cir. 1993) (as amended on petition for rehearing).  In addition, we
noted that a court of appeals in exercising plenary review over an order granting o
denying a motion for judgment as a matter of law must apply the same standard as di
district court. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 199
Lippay v. Christos, 996 F.2d 1490, 1496 (3d Cir. 1993). We recently outlined the re
standard:

> In deciding whether to grant a motion for JNOV, the trial court must view the
> evidence in the light most favorable to the non-moving party, and determine
> whether the record contains the `minimum quantum of evidence from which a jury
> might reasonably afford relief.'  Keith v. Truck Stops Corp., 909 F.2d 743, 74
> (3d Cir. 1990) (citations omitted).  The court may not weigh the evidence,
> determine the credibility of witnesses or substitute its version of the facts
> for that of the jury.  Blair v. Manhattan Life Ins. Co., 692 F.2d 296, 300 (3d
> Cir. 1982).  The court may, however, enter judgment notwithstanding the verdi
> if upon review of the record, it can be said as a matter of law that the verdi
> is not supported by legally sufficient evidence.  Neville Chem. Co. v. Union
> Carbide Corp., 422 F.2d 1205, 1210 (3d Cir.), cert. denied, 400 U.S. 826 (1970

Parkway Garage, 5 F.3d at 691-92.

I join in Judge Rosenn's opinion because I believe that, even viewed in the l
most favorable to Doe, the verdict winner in the district court, the facts of this
cannot, as a matter of law, support the jury's verdict.  I support this holding bec
factors six and seven of the balancing test announced in United States v. Westingho

21

Elec. Corp., 638 F.2d 570, 578 (3d Cir. 1980), namely SEPTA's need for access to th

prescription information and "whether there is an express statutory mandate, articu

public policy, or other recognizable public interest militating toward access," out

Doe's limited privacy interests in the information.  It is here that, in my view, t

district court in its opinion denying SEPTA's post-trial motions for judgment as a

of law or for a new trial misapplied the Westinghouse balancing test.  The court de

that, because Pierce "never articulated a need to know what Doe's medications were

for or a reason that she did not put the report aside or black out the names when s

them," and because there was testimony that "the names of the individual employees

irrelevant to the issues they were examining," the jury reasonably could have found

six to weigh in favor of a violation of Doe's privacy right.  See Doe v. SEPTA, et

No. 93-5988, slip op. at 19 (E.D. Pa. June 1, 1995).  Likewise, because "the financ

need to control prescription benefit costs . . . does not include a need to have th

of employees linked with their medications, at least until an abuse of the benefit

been established," the district court decided that the jury also could have found f

seven to weigh in Doe's favor.  See id. slip op. at 20.

However, the district court's emphasis on SEPTA's need to have the names of

employees linked with their medications was misplaced.  The focus of factors six an

of the Westinghouse balancing test in this case should not be on appellants' need t

the names of employees linked with their medications, but instead should be on thei

to have access to prescription utilization data in the first place.  As Judge Rosen

opinion notes, it is essential in this era of escalating health care costs that sel

insured employers be able to review their benefits programs for proper usage, cost-

possibilities, and fraud and abuse, among other factors.  Thus, I agree with his

conclusions.

However, I do not believe that Judge Rosenn's opinion reflects the facts of t

in the light most favorable to Doe.  For example, in describing Pierce's actions wi

22

respect to the Rite-Aid report, he states that she highlighted the names on the rep

whose medications she was unfamiliar with "for her research purposes," <u>see</u> typescri

13, and that she "discreetly never mentioned Doe by name" to Dr. Van de Beek.  <u>Id.</u>

Yet, Pierce's motivations for highlighting the names of the employees, in particula

Doe's, was a primary factual issue in the case, as was her possible carelessness.

Clearly, Doe did not claim that Pierce highlighted the names merely for her researc

purposes, nor would he have described her behavior as "discreet."  The jury's verdi

Doe, then, might reflect its agreement with his assertions that her motivations, as

as her conduct, were improper.  In any case, it does not seem that Judge Rosenn's o

paints the issue in the light most favorable to a verdict for Doe.  Although I rega

point as somewhat academic because of my analysis of the <u>Westinghouse</u> factors, it i

noting because of our clear mandate to view the facts in the most favorable light t

verdict-winner in reviewing a denial of a motion for judgment as a matter of law.

More substantively, I do not agree with Judge Rosenn's analysis regarding Pie

contact with Dr. Press.  While it is true that Dr. Press did not acquire any new

information from Pierce's actions, the focus of an inquiry into an alleged violatio

the constitutional right to privacy should be on whether there was a disclosure.  A

initial matter, Pierce showed Dr. Press the highlighted list containing Doe's name

prescription information.  Pierce did not know whether Dr. Press had any prior know

regarding Doe's condition; nevertheless, she presented the information to Press.  T

constitutional right to privacy is intended to prevent certain disclosures.  Thus,

ordinarily individuals have the power to determine to whom they disclose their most

personal matters.  Here, Pierce impinged on Doe's right with the disclosure to Pres

the same way that she did so with respect to the disclosure to Aufschauer.  As Judg

Rosenn's opinion states, "[a] disclosure occurs in the workplace each time private

information is communicated to a new person . . . ."  Typescript at 14.

23

Yet Doe himself already had informed Dr. Press voluntarily of his condition.

Pierce's disclosure to Press, then, should not lead to Doe's recovery of damages, s

the disclosure left Doe in the same position as before it occurred.  This issue is

damages alone, however, and does not affect the existence of a disclosure to Press.

the court must weigh this disclosure as well as those involving Pierce and Aufschau

order to determine whether a constitutional violation occurred. Accordingly, in my

is not enough simply to state that because no damages were incurred there could not

been a violation of Doe's privacy right.  In the end, though, the existence of a th

disclosure in the case does not alter my analysis of the <u>Westinghouse</u> factors and

therefore does not change my ultimate conclusion that we should reverse the judgmer

the district court.

I also want to make a clear distinction between an impingement into privacy r

that is justified according to the <u>Westinghouse</u> factors, and an <u>unconstitutional</u> vi

of the right to privacy.  We have held that questions seeking personal medical info

included in a police department questionnaire for use in selecting applicants for a

special investigations unit "[did] not unconstitutionally impinge upon the applicar

privacy interests." <u>Fraternal Order of Police v. Philadelphia</u>, 812 F.2d 105, 114 (

1987) (footnote omitted).  We also have held that the strong public interest in

facilitating the research and investigations of a government agency into a potentia

hazardous work area "justif[ied] [the] minimal intrusion into the privacy which sur

. . . employees' medical records . . . ." <u>Westinghouse</u>, 638 F.2d at 580.  However,

neither case did we deny that an intrusion into privacy interests occurred.  Likewi

here we do not deny that Pierce's disclosures impinged upon Doe's privacy interests

prescription information.  We do find, however, that the disclosures were justified

according to the <u>Westinghouse</u> balancing test because of SEPTA's strong interest in

access to utilization review data from its prescription drug program.  Thus, althou

24

there was an impingement into Doe's privacy rights, there was not here an unconstit

violation of those rights.

Finally, regarding specific applications of the Westinghouse factors: Westing

factor four, "the injury from disclosure to the relationship in which the record wa

generated," would seem to me to apply to the relationship between Doe and SEPTA, n

relationship between Doe and Rite-Aid, as Judge Rosenn's opinion states. The relat

between Doe and his employer underlies the prescription benefits package in the fir

place; were it not for that benefits package, Doe would not have filled his prescri

at Rite-Aid, nor would his name have been on the Rite-Aid report. In this regard,

injury from disclosure to "the relationship in which the record was generated" obvi

could be much greater if the relevant relationship is that between Doe and his empl

and not the Doe-Rite-Aid relationship. Thus, the factor may have weighed more heav

favor of Doe in the jury's analysis than Judge Rosenn's opinion indicates. Neverth

because of my conclusions regarding Westinghouse factors six and seven, I still bel

that Doe cannot recover for the disclosures made in this case.

Westinghouse factor five, "the adequacy of safeguards to prevent unauthorized

disclosure," also could have weighed more heavily in favor of Doe in the jury's ana

than Judge Rosenn indicates. While it is true that Pierce and SEPTA did not reques

information as would put them on notice that they would need to pre-arrange for its

confidential handling, it would not have been unreasonable for the jury to conclude

SEPTA should have had some sort of policy regarding the confidentiality of employee

medical information that would have put Pierce on notice of the sensitivity of the

information she received. Moreover, it also would have been reasonable for the jury

expect Pierce to act more carefully with the information regardless of the existenc

official SEPTA policy, especially because of her high executive level in the compan

addition to her experience as a former government attorney. Thus, although factor f

does not change my ultimate conclusion in the case, perhaps it weighed more heavily

25

favor of Doe, at least in the jury's consideration, than Judge Rosenn's opinion wou

suggest.

I make one final point.  As Judge Rosenn notes, SEPTA did not request the nam

its employees obtaining prescription drugs.  Consequently, the case has been decide

the assumption that it did not need the names.  Nevertheless, I do not understand t

there is any legal impediment to an employer who pays for prescriptions or other be

for employees and their dependents insisting on knowing the identity of the person

obtaining the prescriptions or benefits.  After all, an employer might need this

information to determine whether the person obtaining the prescriptions or benefits

eligible for them. Judge Rosenn makes this important point, typescript at 22 n.5, a

particularly want to emphasize it.  In accordance with the foregoing comments, I jo

Judge Rosenn's opinion with the caveats I have stated and join in the judgment of t

court.

Doe v. SEPTA, et al.

No. 95-1559

LEWIS, Circuit Judge, concurring and dissenting.

I agree with and join in that part of Judge Greenberg's concurring opinion wh[ich] pertains to the first five Westinghouse elements. However, because I believe that [there] was more than a "minimum quantum" of evidence from which the jury in Doe's case cou[ld] reasonably conclude that his constitutional right to privacy had been violated, I respectfully dissent. See Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685 (3d Cir. 1990).

Because my disagreement with the majority rests primarily with its analysis o[f the] sixth and seventh Westinghouse factors, I will focus my discussion on those element[s.]

With respect to the sixth factor, which addresses the degree of need for acce[ss to] the information, I note initially that at Doe's trial, Ms. Pierce, the SEPTA admini[strator] responsible for auditing the company's health benefits plan, testified that for her purposes the employee names on the Rite-Aid printout were irrelevant. In fact, the district court specifically noted that "it was undisputed that the names on the rep[ort] were unnecessary for Pierce's review of the Rite Aid report." (J. Yohn's Memorandu[m at] 16-17). While it is true that SEPTA could have legitimately requested these names [for] auditing purposes, the fact is that in this case it neither required nor requested [this] information.[7] Thus, the jury had no factual basis upon which to conclude that SEPT[A] needed its employees' names in order effectively to audit its health plan.

I disagree that "[t]he focus of factors six and seven of the Westinghouse bal[ancing] test in this case should not be on appellant's need to have the names of employees [along] with their medications, but instead should have been on their need to have access t[o...]

_____

[7] The first Westinghouse factor is the "type of record requested." In this cas[e,] SEPTA did not request that the printout from Rite-Aid include employee names. As a result, I believe that this element of the balancing test does not weigh in Doe's f[avor.]

27

prescription utilization data in the first place." (Concurring Op. at 3).  First,

aware of no authority which suggests that this broad approach is the correct way i

to frame the issue.  Second, the jury's finding that Pierce had no need for the nam

the Rite-Aid printout is not inconsistent with the principle that SEPTA may have ha

legitimate need for access to prescription utilization data.  Thus, because in my v

record clearly establishes that for purposes of auditing its prescription drug prog

with Rite-Aid, SEPTA did not necessarily need a printout that indicated by name wha

prescription drugs particular employees were taking, I cannot agree that the verdic

"not supported by legally sufficient evidence."  As Judge Greenberg notes in his

concurring opinion, the Parkway Garage standard requires the trial court, and us, t

the evidence in the light most favorable to the non-moving party, and determine whe

the record contains the `minimum quantum of evidence from which a jury might reason

afford relief.'  Keith v. Truck Stops Corp., 909 F.2d 743, 745 (3d Cir. 1990) (cita

omitted)," and to avoid "`weigh[ing] the evidence, determin[ing] the credibility of

witnesses or substitut[ing] [our] version of the facts for that of the jury.' Blair

Manhattan Life Insurance Co., 692 F.2d 296, 300 (3d Cir. 1982)."  Id. at 1.  Accord

we must adhere to the Parkway Garage standard and allow the appropriate measure of

deference to the jury's findings.  For the above reasons, I do not believe that the

majority has done so with regard to the sixth Westinghouse factor.

With respect to the seventh Westinghouse factor, I agree that there is an imp

public interest in allowing companies such as SEPTA, which administer their own hea

plans, to have access to the prescription drug records of their employees. (Maj. Op

20-21).  In general, I would agree that such employers have a legitimate need for t

information. Nevertheless, I do not believe that this interest, standing alone, is

sufficient to overcome the other Westinghouse factors, which in this case weigh lar

Doe's favor.  Moreover, in my view, the majority places a disproportionate emphasis

factor seven, so much so that the remaining elements of the balancing test become

28

practically irrelevant to its analysis.  To my knowledge, we have never suggested t

seventh <u>Westinghouse</u> factor is the most significant consideration in our analysis.

Accordingly, because under the highly deferential <u>Parkway Garage</u> standard there cle

sufficient evidence in the record to support the jury's verdict in favor of Doe, or

again I believe we are bound to affirm the district court's order.

Finally, I am concerned that the majority's decision on the issue of SEPTA's

liability appears to be influenced, at least in part, by the fact that Doe was neit

fired, harassed nor demoted. (<u>See</u> Maj. Op. at 18 ("This potential for harm, however

should not blind us to the absence of harm in this case.")).  I do not understand h

why this point is at all relevant to our legal analysis of the liability issue.  In

view, the nature and extent of harm Doe suffered as a result of the disclosure that

occurred is a damages rather than a liability issue. Moreover, as I understand the

of the majority position, even if Doe had suffered a more direct harm in this case

for instance, on the job harassment), SEPTA's actions still would not have constitu

violation of Doe's limited privacy right against disclosure, because this right was

outweighed by the strong public interest favoring SEPTA's access to prescription dr

information for auditing purposes.  Again, I disagree.

But I am particularly troubled by the potential implications of the majority'

position.  I hope I am wrong, but I predict that the court's decision in this case

make it far easier in the future for employers to disclose their employees' private

medical information, obtained during an audit of the company's health benefits plan

to escape constitutional liability for harassment or other harms suffered by their

employees as a result of that disclosure.

For the above reasons, I respectfully concur and dissent.

29